# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

**MEDCO ENERGI U S L L C**    **CASE NO.  2:23-CV-01755**

**VERSUS**        **JUDGE JAMES D. CAIN, JR.**

**DOUG BURGUM ET AL**    **MAGISTRATE JUDGE CAROL B. WHITEHURST**

## <u>MEMORANDUM RULING</u>

Before the court are cross-motions for summary judgment filed, respectively, by plaintiff Medco Energi US LLC ("Medco"), as predecessor in interest to Sanare Energy Partners, LLC ("Sanare") (referred to collectively as "Plaintiff") and by defendants Doug Burgum, Secretary of the United States Department of the Interior ("DOI"), and Howard Cantor, Director of DOI's Office of Natural Resources Revenue ("ONRR"). Docs. 25, 27. Both motions are opposed. Docs. 27, 29. Also before the court is a Motion to Admit Exhibit 5 [doc. 32] filed by plaintiff, with opposition [doc. 34] from the government.

## I.
### BACKGROUND

### A. 2017 and 2018 Fee Assessment Background

This suit arises from inspection fees assessed by ONRR to plaintiff, a lessee on multiple offshore federal mineral leases in the Gulf of Mexico, in 2017 and 2018. Three leases give rise to the facility inspection fees at issue: Lease OCS-G 04909 ("MP 64"); Lease OCS-G 05692 ("MP 65"); and Lease OCS-G 05392 ("EC 317"). Nineteen installations form the MP 64 lease block. AR 229. One of these, referred to as the "A, AQ

Platform," consists of two installations containing processing and metering equipment and a separate, smaller installation containing a well (#2). *Id.* The three facilities are in close proximity and connected via walkways:



AR 240. The A, AQ platform is surrounded by eighteen individual wells that tie back to this central structure via subsea flowlines. AR 229–30. These eighteen wells are supported by caissons that protrude above the waterline and contain drive pipes and small work decks for accessing the wells. *Id.* They range in distance from one third of a mile to over one mile from the A, AQ platform. AR 239. The following map depicts the arrangement of Medco's wells in relation to the A, AQ platform (circled in blue) within the MP 64 lease:



AR 238. Two views of caissons from the MP 64 block are shown below, with other caissons visible in the distance:





AR 241.

Beginning with Fiscal Year 2010, Congress directed DOI to offset its appropriations

with inspection fees. AR 227. From that time forward, Medco was assessed fees annually

for BSEE's inspection of 23 to 26 facilities—including the MP 64 block facilities at issue

here. AR 527–80. At no time did ONRR or BSEE ever treat the MP 64 block as a single installation for the purposes of assessing inspection fees. *See id.*

### B. ONRR Director Decision

Medco appealed the 2017 and 2018 fee demands to the ONRR director, who consolidated the appeals. AR 96. There it asserted that (1) ONRR lacked authority to issue the invoices under the 2017 and 2018 Continuing Resolutions and (2) ONRR incorrectly categorized the well installations as separate facilities.[1] AR 104–27. The ONRR director denied this appeal on January 28, 2020. AR 226. To this end ONRR determined that the 2017 and 2018 Continuing Resolutions preserved its authority to collect inspection fees, and that even if the Continuing Resolutions had not preserved this authority, the subsequent Consolidated Appropriations Acts "cured any such defect" by "specifically directing the Secretary to assess and collect the fees for fiscal years 2017 and 2018." AR 232–33. Finally, ONRR determined that BSEE properly exercised its discretion to categorize Medco's well installations as separate "facilities," despite their subsea attachments. AR 233–34. It noted that, in cases where the facilities were not connected by a walkway, "a BSEE inspector is required to locate such structures and to take a boat to separately inspect each structure," which "results in a more complex, and time- and resource-intensive inspection and a separate inspection fee is [therefore] warranted." AR 234. Accordingly, the director decided that characterization of the caissons as separate facilities was

---

[1] Medco also appealed inspection fees assessed on the East Cameron 318 lease block and on a Main Pass 55 installation. ONRR consolidated the matters and granted the appeal as to the East Cameron 318 and Main Pass 55 fees. AR 235–36. Those portions of the appeal are not at issue here.

"consistent with BSEE's long-standing practice" and that the decision must be upheld. AR 235.

## C. IBLA Appeal

Medco then sought review of ONRR's decision from the Interior Board of Land Appeals ("IBLA"). IBLA issued a decision on July 14, 2021, reversing ONRR as to BSEE's authority to collect fees under the Continuing Resolutions.[2] Doc. 25, att. 1 (IBLA 199). It stated:

> It is true that the continuing appropriations acts for fiscal years 2017 and 2018 authorized funding at levels sufficient to allow the Department of the Interior to operate as it did under the previous year's consolidated appropriations act. But each of the prior consolidated appropriations acts directed the Secretary to collect inspection fees for facilities subject to inspection under the OCSLA *only for a single fiscal year*. For example, the fiscal year 2016 consolidated appropriations act stated: "In fiscal year 2016, the Secretary shall collect a nonrefundable inspection fee, which shall be deposited in the 'Offshore Safety and Environmental Enforcement' account, from the designated operator for facilities subject to inspection under 43 U.S.C. 1348(c)." The fiscal year 2017 consolidated appropriations act used identical language, except specific to fiscal year 2017. In these acts, Congress expressly limited the Secretary's authority to collect inspection fees to a single fiscal year, and the continuing appropriations acts did not extend the Secretary's authority into the next fiscal year.
>
> As Medco notes in its appeal, Congress could have provided authority to the Secretary to collect inspection fees in fiscal years 2017 and 2018 by including language in each of the applicable continuing appropriations acts specifically authorizing this action. But Congress did not do so. Accordingly, the continuing appropriations acts did not provide authority to the Secretary to collect the fees in ONRR's orders for fiscal years 2017 and 2018. It was not until Congress enacted the consolidated appropriations acts for fiscal years 2017 (in May 2017) and 2018 (in March 2018) that it provided the Secretary with the authority to collect inspection fees for those fiscal years.

---

[2] All documents in this case that post-date the ONRR director's decision are not part of the administrative record, but the parties have agreed that IBLA decisions and Interior Solicitor's M-Opinion may be cited because they are publicly available legal sources and provide necessary background to the case.

*Id.* at 10–11 (IBLA 208–09) (emphasis in original). The IBLA also concluded, contrary to the ONRR director, that the 2017 and 2018 Consolidated Appropriations Acts did not "cure" ONRR's lack of authority to make fee demands because the statutes lacked the express language required to indicate that they should operate retroactively. *Id.* at 12 (IBLA 210).

### D. DOI Solicitor's M-Opinion

The DOI Solicitor then issued Memorandum Opinion M- 37071 ("M-Opinion") to the Secretary on October 12, 2021, addressing the IBLA's decision in *Medco Energi LLC*, No. 2020-184 and its conclusion "that the BSEE fee collection lapsed during the period of a Continuing Resolution (CR), as the authority purportedly had been limited to the prior fiscal year by the applicable appropriations act." Doc. 25, att. 2 (M-Opinion), p. 1. The solicitor characterized this decision as "an incorrect reading of applicable law [that] may not be relied upon by any employee of the Department." *Id.* In support, the solicitor explained that BSEE's inspection program is a "project[] or [a]ctivit[y]" under the Continuing Resolutions and must therefore be continued under the same "conditions and authority" as the prior years' Appropriations Acts. *Id.* at 6–7. Because those Acts provided the Department with authority to assess fees to offset its inspection activity, the Continuing Resolutions extended that authority. *Id.* at 7–9.

### E. IBLA Vacatur

After issuance of the M-Opinion, ONRR sought reconsideration from the IBLA. Doc. 25, att. 3 (IBLA Decision to Vacate). The IBLA granted the motion, vacated its prior decision in a ruling issued on May 23, 2022, and retained jurisdiction over the matter for

the purposes of "issu[ing] a final decision or order consistent with the M-Opinion that addresses the merits of Medco's appeal." *Id.* at 2. The matter languished for over a year, however, and the IBLA failed to issue a new merits decision within the agency's 33-month deadline for deciding appeals of ONRR orders under 30 U.S.C. § 1724(h)(1). *See* doc. 25, att. 4 (IBLA Dismissal Order). Accordingly, the board dismissed the appeal for lack of jurisdiction on June 22, 2023. *Id.*

### F. District Court Litigation

Plaintiff then sought judicial review of DOI's final decision through a Complaint for Declaratory and Injunctive Relief filed in this court. Doc. 1. In addition to the arguments it raised before ONRR regarding lack of statutory authority and excessive inspection fees, it asserts that (1) the ONRR director decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law and (2) the ONRR director decision constitutes a legislative rule issued in violation of the APA's rulemaking procedures. *Id.* The parties have now filed cross-motions for summary judgment, addressing these arguments. Docs. 25, 27. At the court's instruction, plaintiff has also filed a Motion to Admit Exhibit 5 [doc. 32] relating to the Statement of Reasons provided by Medco to the IBLA on August 21, 2020, as part of its appeal of the ONRR director decision. *See* doc. 25, att. 5 (Medco SOR). In its Motion for Summary Judgment, plaintiff requested that the court take judicial notice of this document even though it was not part of the administrative record. The government opposes plaintiff's request. Doc. 34.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
### LAW & APPLICATION

### A. Request for Judicial Notice/Motion to Admit

In addition to the extra-record documents that the parties have agreed the court may consider, *supra* note 2, plaintiff requests that the court take judicial notice of a Statement of Reasons provided by Medco to the IBLA on August 21, 2020, as part of its appeal of the ONRR director decision. *See* doc. 25, att. 5 (Medco SOR); doc. 32. The government objects, arguing that (1) the SOR and its attachments are not amenable to judicial review because they contain unverifiable and contested factual information and (2) the SOR is a post-decisional document to the ONRR director decision. Although the last merits decision was the one made by the ONRR director, plaintiff argues that it should not be limited to the record up to that point. To do so, it maintains, would reward IBLA for sitting on its hands and failing to timely issue a merits decision after it reversed course based on the solicitor's M-Opinion.

"Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 610 (W.D. La. 2010) (quoting *Louisiana ex rel. Guste v. Verity*, 853 F.3d 322, 327 n. 8 (5th Cir. 1988)). This principle is known as the record rule and prevents the reviewing court from conducting a de novo trial. *Id.* Certain exceptions exist, however, and the Fifth Circuit has allowed supplementation of the administrative record when: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . . (2) the district court needed to supplement the record with "background

information" in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Texas v. U.S. Dep't of Homeland Sec.*, 2023 WL 2842760, at *1 (S.D. Tex. Apr. 7, 2023) (quoting *Medina Cnty. Envir. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010)). Courts in this circuit have also "routinely permitted extra-record evidence" in several circumstances, including "[i]n cases where evidence arising after the agency action shows whether the decision was correct or not" *Id.* (citing *Texas v. Biden*, 2021 WL 4552547, at *2 (N.D. Tex. Jul. 19, 2021)).

The SOR could fit into both the "background information" and "evidence arising after agency action" exceptions. The parties' joint scheduling plan, however, set a deadline for addressing issues concerning the administrative record. Specifically, this plan (adopted through order of the magistrate judge) provided:

> (2) The parties shall attempt to amicably resolve any issues concerning the scope or content of the administrative record before moving the Court for relief. Federal Defendants shall initially present the administrative record to Plaintiff on Friday, July 14, 2024, and the parties will first work to resolve any issues informally. Any issues which the parties cannot resolve among themselves shall be presented to the Court by motion submitted by Plaintiff within 14 days of the lodging of the administrative record.

Doc. 16, p. 2. The deadline for federal defendants to lodge the administrative record was subsequently extended, by consent motion, to July 19, 2024. Docs. 20, 21. The government met this deadline but plaintiff did not raise any issue with the record until its request in this motion for summary judgment motion filed nearly two months later, on September 17, 2024. Plaintiff now attempts to categorize Exhibit 5 as "motion evidence" under Rule 56 rather than part of the administrative record. It also maintains that the facts in the SOR are

not seriously disputed by the government, and that the court should take judicial notice of them. The government disagrees, noting that plaintiff is repeatedly citing its own witness's declaration for the truth of the matter asserted therein—namely, his opinion on the complexity of BSEE's inspections and the total inspection time onboard a caisson during the relevant fiscal years when his statements only pertain to inspections occurring after the years at issue.

To the extent plaintiff seeks to supplement the administrative record under some exception, its request is time-barred and will not be considered. Otherwise, "the use of judicial notice is highly restricted in the context of APA claims." *Am. Health Care Ass'n v. Burwell*, 217 F.Supp.3d 921, 928 (N.D. Miss. 2016). Because APA review is limited to the administrative record before the agency at the time of the decision, "judicial notice of an adjudicative fact *not* part of the administrative record generally is *irrelevant* to the court's analysis of the merits." *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F.Supp.2d 15, 32, n. 14 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) (emphasis in original). The government has pointed out serious disputes to the main factual assertions in Exhibit A, which was executed after the ONRR decision, and as for the remainder the court finds no reason to consider matters outside the administrative record. Although this evidence was before a subsequent body, it was not at issue in the decision under review and the court must generally confine its review to the record before ONRR. To the extent plaintiff would have this evidence before the court through a supplement to the administrative record, it should have complied with the parties'

scheduling order. If it now wishes to obtain court action based on consideration of this opinion and exhibits, it must present it to the agency through a new appeal.

### B. Motions for Summary Judgment

"Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record." *Nat'l Assoc. for Gun Rights, Inc. v. Garland*, 741 F.Supp.3d 568, 596 (N.D. Tex. 2024) (citing *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022)). Thereunder, courts may decide "as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Delta Talent, LLC v. Wolf*, 448 F.Supp.3d 644, 650 (W.D. Tex. 2020). The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

Plaintiff argues that ONRR's decision must be set aside on the following grounds: (1) ONRR arbitrarily and capriciously increased its inspection fees to bill well caissons at the same rate as large platforms; (2) ONRR modified existing regulations without undertaking notice-and-comment rulemaking; and (3) ONRR assessed the demands without statutory authority. Doc. 25.

### 1. Arbitrary and capricious

The APA's arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414,

423 (2021). The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (internal quotations omitted). Put another way, the reviewing court must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. In reviewing an agency's action, the court may only consider the reasoning articulated by the agency itself and may not credit post hoc rationalizations. *Wages and White Lion Investments, LLC v. USDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 53 (1983)).

Plaintiff maintains that it was arbitrary, capricious, and outside of the agency's statutory authority for BSEE to treat each caisson as a separate facility, thereby drastically increasing the inspection fees. The government argues that this interpretation complies with BSEE regulations, which reasonably and consistently interpreted ONRR's statutory authority under the Consolidated Appropriations Act.

The 2016 and 2017 Consolidated Appropriations Acts directed the Secretary to "collect a nonrefundable inspection fee . . . for facilities subject to inspection under 43 U.S.C. 1348(c)" of OCSLA. Consolidated Appropriations Act 2016, PL 114-113, 129 Stat. 2242, 2549; Consolidated Appropriations Act 2017, PL 115-31, 131 Stat. 135, 459. Qualifying facilities are subject to the following annual inspection fees: (1) $10,500.00 for facilities with no wells but with processing equipment or gathering lines; (2) $17,000.00 for facilities with one to ten wells; and (3) $31,500.00 for facilities with more than ten

wells. *Id.* Plaintiff's eighteen caissons on the M 64 Unit were each treated as individual facilities subject to the $17,000.00 annual fee. *See* AR 001–05.

OCSLA provides, in relevant part:

**Onsite inspection of facilities**
The Secretary and the Secretary of the Department in which the Coast Guard is operating shall individually, or jointly if they so agree, promulgate regulations to provide for--
**(1)** scheduled onsite inspection, at least once a year, of each facility on the outer Continental Shelf which is subject to any environmental or safety regulation promulgated pursuant to this subchapter, which inspection shall include all safety equipment designed to prevent or ameliorate blowouts, fires, spillages, or other major accidents; and
**(2)** periodic onsite inspection without advance notice to the operator of such facility to assure compliance with such environmental or safety regulations.

43 U.S.C. § 1348(c). BSEE's regulations implementing OCSLA define the term "facility" in multiple contexts. 30 C.F.R. § 250.105. For inspections, the term means "installations permanently or temporarily attached to the seabed of the OCS." *Id.* A "group of OCS installations" only qualifies as a "single facility" if it is "interconnected with walkways" **or** "includes a central or primary installation with processing equipment and one or more satellite or secondary installations." *Id.* The regulations also provide, however, that "[t]he Regional Supervisor may decide that the complexity of the individual installations justifies their classification as separate facilities." *Id.*

Plaintiff maintains that the treatment of its caissons as separate facilities is arbitrary and capricious because they are connected to a central installation—the A, AQ platform—containing all processing and metering equipment. AR 229. In return the government relies

on a declaration from BSEE Regional Supervisor for District Field Operations, Michael

Saucier. Mr. Saucier states, in relevant part:

> Where secondary or satellite installations are attached to the primary facility via subsea tiebacks, but the installations rise above the waterlines some distance from the primary facility without a walkway connection, BSEE considers these secondary or satellite structures to be separate facilities, because the installation arrangement results in more complex, and time- and resource-intensive inspections.

> In determining the number of Medco facilities in the Main Pass 64 lease block, pursuant to this longstanding practice, my staff and I decided that Medco's above-water secondary or satellite single-well caisson installations attached to its primary A, AQ facility only via subsea flowline, and without a walkway, are separate facilities.

> Characterization of such caissons as separate facilities is consistent with BSEE's longstanding practice. Changing course on BSEE's practice and this longstanding application of regulations could have significant operational and financial impacts on BSEE.

AR 242–43, ¶¶ 7–9. Plaintiff maintains that because the regulation only permits the

supervisor to make a determination based on "the complexity of the individual

installations," he may not consider their arrangement or its impact on the time needed for

inspections. But as BSEE notes, the regulation allows the regional supervisor to consider

the "complexity of the individual installations" rather than "the complexity of an individual

installation." Given the impact of the arrangement on inspection time and cost, this factor

is directly relevant to the director's determination. His declaration reflects that he

considered the fact that the caissons were "some distance" from the platform and that this

arrangement "results in more complex, and time- and resource-intensive inspections."

Additionally, plaintiff fails to refute the director's statement that this treatment "is

consistent with BSEE's longstanding practice." An agency's decision to follow

longstanding practice in a case is the antithesis of arbitrary and capricious. Accordingly, plaintiff's arguments under this APA standard fail.

### 2. Rulemaking violation

Plaintiff also argues that ONRR was required to engage in notice-and-comment rulemaking to conform its longstanding interpretations to the regulation. As the government notes, Medco waived this claim by failing to raise it with the ONRR Director. *See Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 521 (5th Cir. 2023) ("Under ordinary principles of administrative law a reviewing court will not consider arguments that parties failed to raise in timely fashion before an administrative agency.") (cleaned up). But even if the argument were properly before the court, it is without merit. Plaintiff maintains that the regional supervisor's determination amounts to a new legislative rule, because the applicable regulation indicates that installations that "include[] a central or primary installation with processing equipment and one or more satellite or secondary installations" should ordinarily be treated as one facility. The regulation, however, goes on to grant the regional supervisor broad authority to classify installations as separate facilities based on "the complexity of the individual installations." 30 C.F.R. § 250.105. While plaintiff argues that the supervisor merely relied on longstanding practice without "consider[ing] the factors that would make an installation more complex," it points to nothing in the regulations limiting the supervisor's discretion beyond the word "complex." And the supervisor addressed the complexity in his determination that the arrangement of facilities in the platform required "more time- and resource-intensive inspections." AR 242–43. The regional supervisor's declaration thus indicates that this discretion was

exercised within the bounds of his regulatory authority, rather than as the creation or extension of a rule.

### 3. Statutory authority

Finally, plaintiff argues that BSEE exceeded its statutory authority by assessing inspection fees for 2017 and 2018 while still operating under Continuing Appropriations Acts. The 2016 Consolidated Appropriations Act provided:

> (a) In fiscal year 2016, the Secretary shall collect a nonrefundable inspection fee, which shall be deposited in the "Offshore Safety and Environmental Enforcement" account, from the designated operator for facilities subject to inspection under 43 U.S.C. 1348(c).
> (b) Annual fees shall be collected for facilities that are above the waterline, excluding drilling rigs, and are in place at the start of the fiscal year. Fees for fiscal year 2016 shall be:
>> (1) $10,500 for facilities with no wells, but with processing equipment or gathering lines;
>> (2) $17,000 for facilities with 1 to 10 wells, with any combination of active or inactive wells; and
>> (3) $31,500 for facilities with more than 10 wells, with any combination of active or inactive wells.

PL 114-113, 129 Stat. 2242, 2549. The 2017 Continuing Appropriations Act, in effect at the time the 2017 fee demands were issued, then provided:

> Such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2016 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2016, and for which appropriations, funds, or other authority were made available in the following appropriations Acts:
> . . . .
> (7) The Department of the Interior, Environment, and Related Agencies Appropriations Act, 2016 (division G of Public Law 114-113).

PL 114-223, 130 Stat. 857, 908. The 2017 Consolidated Appropriations Act then passed, with an identical allowance for inspection fees (changing fiscal year 2016 to 2017). PL 115-31, 131 Stat. 135, 459. The 2018 Continuing Appropriations Act likewise provided:

> Such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2017, and for which appropriations, funds, or other authority were made available in the following appropriations Acts:
> . . . .
> (7) The Department of the Interior, Environment, and Related Agencies Appropriations Act, 2017 (division G of Public Law 115–31), except that the language under the heading "FLAME Wildfire Suppression Reserve Fund" in the Departments of Agriculture and the Interior shall be applied by adding at the end the following . . . .

PL 115-56, 131 Stat. 1129, 1139–40.

Plaintiff maintains that assessment of fees under the Continuing Resolutions was inappropriate, because the resolutions only referred to Appropriations Acts authorizing the collection of fees for their respective fiscal years. In considering whether an agency has exceed its statutory authority, the court no longer applies *Chevron*[3] deference and instead "independently interpret[s] the statute and effectuate[s] the will of Congress subject to constitutional limits." *Loper Bright Enterps. v. Raimondo*, 603 U.S. 369, 395 (2024). To this end the reviewing court must determine the "best reading" of the statute rather than "a merely permissible reading." *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 617 (5th Cir. 2024) (internal quotations omitted). But statutory interpretation still begins with the text,

---

[3] *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (setting forth two-step framework of determining if agency action exceeded statutory authority, which required court deference to an agency's permissible construction of an ambiguous statute).

"and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004), quoted in *Texas v. U.S. Dep't of Labor*, __ F.Supp.3d __, 2024 WL 4806268, at *13 (E.D. Tex. Nov. 15, 2024).

Both the 2017 and 2018 Continuing Appropriations Acts continued funding "under the authority and conditions" provided in the previous years' Consolidated Appropriations Acts. They therefore appear to unambiguously provide for Interior to collect funds under the same conditions as the prior year. As the government notes, Interior's annual inspection program qualifies as a "project[] or activit[y]" for which "appropriations, funds, or other authority" were made available in the prior year's Appropriations Act through both Congressional appropriations and authority granted to the Department to offset those amounts through fees. *See* 129 Stat. at 2535; 131 Stat. at 446. The Continuing Resolutions both contain broad language indicating that the status quo should be maintained and the inspection program, in place since 2010, was not an ad hoc venture. And as the government notes, all appropriations in the respective Consolidated Appropriations Acts are limited to their respective fiscal years before being broadly continued by the ensuing Continuing Appropriations Acts. Even if the text is ambiguous, plaintiff's argument presents the more strained reading of the statute. Accordingly, there is no basis for invalidating ONRR's fee demands.

## IV.
### CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [doc. 25] and Motion to Admit [doc. 32] will be **DENIED** and the government's Motion for Summary Judgment [doc. 27] will be **GRANTED**.

**THUS DONE AND SIGNED** in Chambers on the 26th day of February, 2025.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**